We will proceed next with argument in Appeal No. 2, Chancellor Manor v. United States. All right, Mr. Dentzer, you may proceed. For both councils, there is utterly no reason to repeat arguments or debates that have already I assume, and therefore we should try to move forward to new ground, not replow old ground. I will follow that, Your Honor. May it please the Court, we have been talking about the economic impact test. I would like to talk, spend a few more minutes about the snapshot approach itself, things that we haven't had a chance to discuss. One of the problems with it is... Your arguments need to be confined to the Chancellor Manor plaintiff. We're not having further argument on Seneca Gardens. I will draw the Court's attention to the fact that the trial court may use its analysis. It's basically, it is the same analysis. I won't repeat anything that I've said, but if the Court didn't make separate legal findings for one case and the other, they are the same. We understand that, but nevertheless... Well, let me try this, and if the Court believes I'm replowing old ground, I certainly will move on. The snapshot approach, and this gets back to something... Isn't she just getting back in the same step? If you don't want me to address the snapshot approach, there are... New and different arguments. New and different arguments. I will move on, Your Honor, to the question of investment-backed expectations. The proper method to... The proper question to ask on investment-backed expectation is... And this is where there's perhaps a bit of tension between the Chancellor Manor and the Seneca Gardens decisions, although they can be reconciled. From an objective point of view, would a reasonable investor have invested in the properties if he or she knew about the temporary limit? What's the error? What are you addressing? What did the trial judge do wrong on this prong of the Penn Central test? The trial judge did not look at whether a reasonable... He didn't apply this test. Why do you say that? Because he didn't ask whether a reasonable investor would have participated in this deal had he or she known at the time about the future regulations. Well, what do you think that he did ask? Well, he asked a different question. He said, look, back then, did they expect a pre-payment? And the answer was yes. Oh, no, no. Come on. Come on. He did not limit his analysis to some momentary, subjective, emotional state of mind of certain owners on a certain date. That's just not a fair reading of the opinion. Your Honor, it's not that he did that. What he did was he looked at whether the… He did not try to measure the import of their expectation. He did not say, was this expectation more important than these expectations or those expectations? What are the import of those? What are the import of these? And more importantly, what would have been… So you're not arguing objective versus subjective at all. Now you're arguing something quite different. You're arguing expectations about exactly what. No, we are arguing that the proper way, as we read Chancellor Mader and Seattle Regard, the proper way to formulate the test is first you ask the objective question. What would a reasonable investor have done? And then you ask, subjectively, did this investor have that expectation? And what's the error? And the error is that the court didn't ask the first question. Objectively, would someone presenting with, say, the skyline view deal? Well, I think he did as I read the opinion, but there's no point in debating that because every member of the panel will read it and make their own conclusion. You have your conclusion, so let's move on. Mr. Dentzer, did you try the case law? Yes, Your Honor. In Chancellor Mader, one of the items that we did point out was the private placement memorandum. Yes, Your Honor. Is the private placement memorandum ever put into the record to any of these deals? In the Seattle Regard case. If you mean by that a prospectus, Your Honor. Well, the PPN, which is a private placement memorandum which is issued in particular situations to entice people into investing in these deals. There wasn't one found, as I understand it, in the Chancellor Mader case. Did you request one? I'm sorry, Your Honor. Did you request it during the discovery? Yes, absolutely. In the Seattle Regard case, one was found, and that was the skyline view prospectus. Is that part of the record? Yes, absolutely. Is then the joint appendix? It is in the Seattle Regard's joint appendix, but the trial court said everything was cited, I mean, was used as evidence. The entire PPN is in the Shenandoah Gardens appendix? I don't know if the entire one is, but the court can find the excerpts of it at – I will get that side, Your Honor. There are only excerpts in there. Very, very limited, if at all. Do you want the whole agreement? I think the entire PPN could be submitted. A3018, we'd be happy to put that in the record. It is definitely in the record below, and we'd be happy to provide it to the court. Provided promptly, please. Absolutely, Your Honor. It does show – what it shows, if the court would like me to address it briefly – what it shows is this. There is no discussion about prepayment in 20 years. There is no discussion about moving to market grants or anything in 20 years. In fact, what it assumes is that the property will be worth $1 in 20 years. And the reason it makes that assumption is because what it wants to show the prospective buyers is that tax benefits are so valuable, it doesn't matter what happens in 20 years. Isn't that really your best argument for investment-backed expectations? And we made that long and hard to the trial. And all of these are? Yes. And, in fact, the point is that if – I mean, 95 percent of Skyline View was bought by limited partners based on that prospectus. More than half of the people who own that property on the alleged taking date bought it based on a document that said – that makes no mention of prepayment, raising rents, or anything. And so that is the only piece of paper that exists from when these deals were put together that shows true investment-backed expectation. And the trial judge said basically – I mean, he didn't give it anyway. He didn't give the tax benefits anyway because he said, look, we know they expect it to prepay. So who cares how good the tax benefits were? Who cares how important they were? And so he didn't compare them and say, well, but they were so much more important. In fact – How come we couldn't find the PPMs for the other deals? I don't know if they – we don't know if they existed or not. You can't sell any of these units without a PPM. It's our understanding that they may not have existed for a chance for a matter that – What do you mean they didn't exist? They were not syndicated. The properties that were syndicated had to put those together. But for some of them, the chunks of the property were just sold to people who knew the owners, and they didn't put together a formal – In violation of securities law. I do – I cannot address that, Your Honor, but mine is – I'm not asking you to address it. I know we asked for it. And basically, their failure to provide any documentation about that is a failure of proof on the plaintiff's part. What the trial court substituted for that was his present impression on what these properties look like and how nice they look. But that isn't an indication. Jonah Goldberg, who testified on behalf of Siena Duggan, but again, all the evidence crossed over, he said point blank that the only reason that the limited partners got into it was because of the tax benefits and that they wouldn't have gotten into it if they weren't the tax benefit. He didn't deny that. And for some of the properties, there were more limited partners than others. So we believe that that should have been the benchmark of – I'm sorry, the base of any analysis into investment-backed expectation. Those were their expectations. And then the second question – Let me be sure I'm following you here. If the papers mentioned tax breaks as an attraction and didn't mention other things, you're saying that the conclusion, the factual conclusion would have to be that the things not mentioned could not have been part of the motivation. Well, I just don't want to use – the word motivation is a little different, Robert. We believe that at a minimum, it has to be but-for. It has to be – investment-backed means it has to be the basis of it. Well, the difference between the basis and a basis – there may have been ten bases, ten motivations, ten attractive features, and maybe one was larger and another was smaller and another was quite small. But you seem to be asking us to adopt the idea that only one can count, and you're saying the one that should have been recognized is the tax incentive, and therefore, no other one is permissible to look at. That's a little counterintuitive to me. Then I overstate. Penn Central talks about in terms of primary incentive. And we believe that it is important to identify and that can resolve it. The tax benefits were the primary. But even if this court were to go beyond that and say, look, there's multiple incentives, the question then is if the limitation on prepayment were – if you said, look, it's going to be three years later or four years later or whatever, would you walk away? That has to be the question. Not only was it an incentive, but how important of an incentive was it compared to everything else? And that's where the trial court didn't – he didn't delve into that question both objectively, what would an objective person do, or subjectively. And so, again, we have an instance where the test was a much more narrow test. And I understand the court doesn't agree with you. But it's just as logical, isn't it, that that was one of the premises which was a given and therefore didn't have to be debated. It wasn't a question of debate, Your Honor. But the Penn Central analysis is a balancing test. So to balance, the court needed to say, look, these are the various benefits. What would have happened if this one were pulled away, or if an objective investor had been told this one would have been pulled away? But did you raise at trial with the witnesses the question of whether that was a factor? Absolutely. We put on an expert witness, a tax witness, who said that this – A tax witness. Yes, who said that this – But didn't the investors testify? My recollection of the past cases is that this was a significant factor, that, no, we're right, we're tied up for 20 years, and that this was – if you didn't accept this premise, you didn't enter into the deal. You did something else. Well, they absolutely had to accept the premise that they had to stay at least 20 years. But whether that was very important – actually, to some extent, it depended on where the property was. Some properties, looking back 20 years, maybe you thought you had a better chance. Some were in areas maybe that didn't seem as likely. But the tax benefits were there for each one. You're talking about an objective investor. An objective investor would have said, look, what do you care about? Do you care about this gusher of tax benefits, this low risk, all these immediate benefits, or do you care that 20 years from now, if the property values, if the areas around it are good, and if there's not a riot and if there's not a recession and all these other variables work out for you, if that happens, it might make sense to prepay it and raise rents, or it might not. And you don't know, and so that's one less risk that you have to take. Is your position that these considerations distinguish Chancellor Manor from any of the others? That is, what is there specific to this case that the government wants us to focus on? Well, specifically, first, you have to ask for each property objectively. It's an objective question for each property. And second, then there's the subjective question. For this case? For this case, there's a problem subjectively in that the people who testified were not the people who put the deal together. Those people had left, and so they didn't even have fact testimony from the people who put the deal together. So they don't have – what happened was they had new people come in and take over. Their partnership still owned the property, so there wasn't a transfer of the partnership, but there were new people running it, and the people who originally got into the deal weren't there. They never took the stand, so they didn't even have the subject of testimony to support that. I really got to say that I am really surprised at the way both sides approached this. I mean you had hundreds and thousands of these deals in the country. The question is not what the objective expectations were with respect to a particular deal. There was a whole atmosphere of these things. There were thousands of private placement memoranda. Nobody bothered to look at this. Everybody decided to look at this in hindsight, which for your testimony and the other side's testimony seems completely unreliable. Why didn't people look at other private placement memoranda that were circulating around the same time to see what the expectations were? Your Honor, we didn't do that, but we did – our expert has experience. Why didn't you do that? I mean what more reliable information could there be? To have people come out, oh, well, this is what they expected 20 years ago. I mean that testimony, whether it's your testimony or the other side's testimony, is inherently unreliable. It's hindsight. Your Honor, I believe that fact testimony of that sort is, but when you have expert testimony, people who are knowledgeable about what happened 20 years ago, and they can say, look, these were tax dollars. Why didn't you look at the actual documents that were circulating 20 years ago? They did not exist for these parties. Well, they existed for thousands of others. Did you not look at any of those either? Your Honor, we have done discovery on many of the plaintiffs who have – who are lined up basically waiting to go into trial. And my understanding is that we haven't seen – if you're asking about private placement memoranda, we haven't seen – I don't know if you've seen any others other than this. This is an industry. It's an industry-wide thing. There are thousands of private placement memoranda. Why don't you both sides look and see what they said? Your Honor, it is my understanding, and I don't believe the counselor will correct me. It's my understanding that they all say about the same thing, which is taxes. These were tax-driven deals. I don't know that. But that expert testimony, unrefuted expert testimony, that that's – I mean when you have a deal that will allow people back then, you could use passive losses to shield your tax benefits. I mean when you use passive losses to shield your cash inflow and people were using it, and everybody made these in limited partnerships so that they could upstream the losses. That was the way that they were set up, and they were recognized. There was even testimony about Congress knew it was setting up a tax-driven deal. All right.  Thank you, Your Honor. Mr. Roberts, would you begin by answering the question that's been raised by Judge Dyke and Judge Gallarza and perhaps others about why the record here is so narrow? You had the burden of proving investment-backed expectations. One might have assumed that you would question the investors, call them as witnesses, find documents relating to comparable deals, and build a record both with regard to these particular persons in deals and what's been described as the whole industry. But it appears that that wasn't done. Why not? Your Honor, I believe that it's a function of mistaken memory of counsel for the government. In fact, the record was reasonably fulsome on this point in the Chancellor Manor case. The fact of the matter is that private placement memorandums for two of the three Chancellor Manor plaintiffs were produced in discovery and were discussed at trial and, in fact, are referenced in certain affidavits that are included in the appendix. But we don't have them. The court does not have them. Well, would you make sure that we get them both in full text promptly, please? Yes, we will, Your Honor. And the further court, I want to make specific comments. What about private place memorandum throughout the industry? Did either side bother to look at those things? No, Your Honor. Why not? Your Honor, we feel that the evidence is overwhelming in this case, as did the trial judge, that the expectations that our clients, in fact, had not only were shamed in the program. How do we know that? If they didn't testify, how do we know what their, in fact, expectations were when they put their money up? They did testify, Your Honor. All of them? All of the owners of the general partnership representatives that still are around with us today testified at trial. I don't understand what you mean, still around. Were the rest deceased? There was one general partner who's no longer with the partnership and was not available for trial. He's no longer related to the client. Well, related or not, you can subpoena witnesses. I don't understand why you're precluded from calling somebody as a witness because they no longer are an investor in a particular partnership. Your Honor, we don't believe that witness was necessary or would have added anything of value to the record. So every investor but one was called? Correct. Anthony Bernardi is the key player in all three of these Minnesota partnerships. They all are Minnesota partnerships. They own three buildings within the Minneapolis metropolitan area. But I'm talking about the individual investors. I'm not talking about the general partner, one person. I'm talking about everybody who put up their money to be a part of the partnership. Mr. Bernardi and his company are the primary investor. They are the decision makers on the Chancellor-Manager deals. These are not syndications. So these are the players. They're the decision makers. So they're the general partner in the deal. Correct. That's what the record shows. Right. But what is the objective investment in the deal itself? That's a very subjective 20-20 hindsight 20 years later as to why I started that particular deal. What is the objective aspects of the investment for the test, the Penn Central test of investment-backed analysis? Right. It's still not part of the record. It's all subjective. I'm not sure what the court means. As far as the dollars and cents of it, the testimony of— What I'm saying is if you have an individual who is a typical investor in these deals, what was the reason why that person invested in the deals? Not the person who essentially was a general partner who 20 years later says, Yes, I invested because I could take the early out on the mortgage. But who was the original investor in the deal and why did they invest at that particular time? Not 20 years later. Well, in our view, Your Honor, the general partner in the case of the Chancellor Manner claims is the primary investor. It is their money that was at stake. They still own these properties today. They bought them as a long-term investment strategy. And so it's their intent, in our judgment, that does need to be evaluated. But what's the proof? How do we know what their intent was? Just their testimony now that 20 years ago or whenever it was, they had such an intent? There are no documents that were contemporaneous with their entering these deals? There were documents, Your Honor. Our brief at pages 7 and 8 of the facts section discusses some of the facts. The trial court does have detailed factual findings, none of which have been challenged here on the appeal, anywhere close to justifying overturning on a clearly erroneous standpoint. A few that demonstrate there was a detailed record, not only oral testimony, but documentation that did corroborate their testimony and their actual expectations. The nature of that documentation was the private placement memoranda. It was also the partnership agreement itself that suggested, that set up the possibility for the general partner to take over more power at that key 20th year and become the manager of the PPM. Were the PPMs taken into account by the trial court? I'm sorry? Were the PPMs taken into account by the trial court? They are not referenced in the court's opinion. They're not referenced at all. There's no indication that they were taken into account. It was an objective analysis of the investment backed expectations at that time, is there? There is not a written opinion on it, but it was evidence at trial, and we think there is substantial other evidence that supports the same conclusion that the court does specifically discuss. Where on pages 7 and 8 is the reference made to the PPM? I don't believe we referenced the PPM in our brief. We did reference a number of other facts that we think support this conclusion. But the question's about documents. Facts are in the eye of the beholder. What we're looking for is documentary evidence as opposed to recollection testimony that has the danger of being a bit self-serving and way out of date. I apologize. Actually, at the bottom of 7, there is a reference to the private placement memoranda. It reads, the private placement memoranda they issued confirmed that permission from HUD to prepay the mortgage was required only during the first 20 years. And I believe those citations are actually to an affidavit which attached that private placement memoranda, and the memoranda itself is not on the record here on appeal. But how does that indicate that this was one of the elements or the primary element for the investment by the particular investor? That helps show that they clearly understood that the 20-year was a critical date, and after that date, that was the opportunity that they were going to have to really make money on these properties. Until that, they were essentially in a partnership with the government to run these things in low-income housing for a very, very low return, a matter of a few thousand dollars a year. Well, what it looks like from the citations to these affidavits is that the private placement memoranda said that the return was largely from the tax benefit. Right? I don't know. I'm not sure which sentence. I'm looking at the pages of the appendix that you cite on page 8 of your brief at the top. There seem to be quotations there from the private placement memoranda that say that the big benefit here is the tax benefit. Well, those were the only benefits essentially in the early years. The tax benefits helped make it possible, one might argue, for the limited return to be tolerable for anybody who's an investor in these things. There are a couple of other things about the tax benefits. I think it's very important to get in play here. Number one is the tax benefits don't go to the entities that are plaintiffs in this case. The entities are partnerships. The tax benefits belong to individuals who have an interest in partnerships. It is a legal distinction. Number two, the government's experts admitted, and the trial court specifically found this, had no information at all that there was any tax benefit to these plaintiffs. That expert simply did not present any evidence that there was any tangible tax benefit to the Chancellor of the American Institute of Properties. There is a failure of proof there to the extent the government argues tax benefits were benefited to our plaintiffs. Could I understand? It seems to me what you're saying is that you're making a distinction between the general partner and the limited partner. What you're saying is that the limited partner didn't expect anything except tax benefits, but the general partner expected something beyond that. Am I understanding you correctly? Well, I do not suggest that the limited partner expected nothing but tax benefits. Was there any evidence that they expected anything besides tax benefits? I don't think there was any evidence from any of the partners to what any specific limit partner expected that they didn't expect. Why weren't they decoded? Why weren't they called? Well, Your Honor, we put on our case, we think it was very persuasive, as did the trial court, and this is the record we're left with. And I think it does more than enough under the objective, reasonable investment-backed expectation standards of this court to support the trial court's finding. The court did a careful analysis. Moreover, Your Honor, in Sienega 8, this court did hold that in that case the expectation that the prepayment right and the right to exit the program after 20 years was not only reasonably expected and could be relied on, but that that was objectively reasonable. This court addressed this issue in Sienega 8 and held based upon the same facts that exist here with respect to the program documents, the nature of the program, the contracts themselves which promised the right to prepay and exit the program after 20 years were all before the court in Sienega 8. It was a different record. We're talking about different plaintiffs, different facts, different records. Your Honor, if anything, the record is stronger here and more complete. Your contention is that you win because Sienega 8 held that you have to win, and I don't see how that argument is tenable because the record was different. Well, the record, there is overlap in the record. Everything that was true in Sienega 8 that proved we should win is true and proves we should win here. I'm talking about the record as it existed at the time of our last decision in Sienega Gardens. That's the decision you're relying on. Right. And that record is different from the record we have here. But it includes the same facts. Well, the facts that were proven in Sienega 8 at the time of your opinion in Sienega 8 in 2003 exist here and are equally true and, therefore, justify the same outcome. Moreover, we put it on the record. Well, if they justify the same outcome, that's a decision we should make looking at the record as it exists now in the appeals before us. We shouldn't say we have to so conclude because of something said in Sienega 8 on a different record. I'm not sure that we have a disagreement on that point. Is the recovery that's being sought here on behalf of both the general partners and the limited partner? The recovery is on behalf of the partnership. So how would that recovery be shared, a certain percentage to the general partner and a certain percentage to the limited partner? That is a function of the rules of the partnership agreement, which I am not familiar with. But there's some sharing. I do not know. You don't know? It sounds like we're out of questions on the reason why investment-backed expectations. I think fundamentally I just want to conclude with saying I think the trial judge applied the correct legal standard. The notion that some subjective number one or primary expectation had to be defined is simply not a workable solution and is not supported by any of the case law. And number two, in applying the analysis, the court had a very solid factual basis and did a very thorough analysis. And the government has come up with no argument here to justify overturning any of those factual findings under the clearly erroneous standard of review. Now, in this appeal on Chancellor Renner, there is one issue that was not raised in the Sienega Gardens appeal. The government has not argued it, and I am happy to leave it to the brief, because I think the argument is clearly exposed of by this court's opinion in Sienega 6, but it is a rightness argument. There were four plaintiffs at trial whose rightness were challenged. Two of them were Sienega plaintiffs, two of them were Chancellor Renner plaintiffs. The government chose not to raise the rightness argument in the Sienega case, but for reasons known to them, they did raise it here, even though it wasn't raised in Sienega. We are happy to leave that on the briefs, but I wanted to make sure I answered any questions the court may have there. A final point where the government suggests there may be a distinction between this case and Sienega 8 involves the Chancellor Manor use agreement and the application of this court's holdings in Independence Park to the notion that the takings extends to the end of the use agreement that was signed by Chancellor Manor. We believe on that case as well that that is disposed of by the Independence Park ruling, which holds that such use agreements are properly viewed as efforts at mitigation, under which the takings was in fact extended beyond hope, and they were all entered into before hope, as was the Chancellor Manor agreement, and therefore there is no reason to reach a different result here. The government does make a comment in its reply brief in Sienega that the use agreement under LIPRA or Title VI should be treated differently than the use agreement under E-LIPA or Title II, but we don't think that is a distinction with a difference. There is no meaningful difference with respect to the two use agreements at stake in both cases. It's the government's taking that compelled the plaintiff into the position of accepting that use agreement, and so the government needs to pay compensation throughout the entire period that it insists that its use restrictions remain in force. You say compelled. Was there a finding that there was compulsion here, or is this just attorney argument? Well, the court did find that the choice to enter the use agreement was not free and unfettered one. That's a specific finding by Judge Leto here, and I think the circumstances make that quite clear. This is a case where the taking had already begun and was continuing, and at the time the use agreement was entered, hope had not been passed, and there was no indication that it would be passed on this record, and so these people at that time had a decision whether to take what modicum of mitigation the government was offering through that use agreement or simply sit and do nothing and wait out the 20 years. I think the law should not punish someone for making a decision to accept what the government was offering by cutting off their claim for just compensation when, in fact, the price to pay for getting that mitigation was extension of their use restrictions and the loss of the opportunity to get out when hope did ultimately pass. So your contention basically is that with respect to the plaintiffs who entered into use agreements, that the question of the taking ought to be determined from the perspective of someone looking at it the day before they entered into the use agreement and without regard to the HOPE Act. That is correct. Yes, they were all, as a matter of factual chronology, those transactions occurred before HOPE was enacted, and the court specifically found that our clients had no reason to expect HOPE was going to be passed. All right. Anything further? Your Honor, would the court permit me to get back into the issue of the statutory options in terms of their impact on the takings analysis? If you have something new and different that hasn't already been produced here this morning. Well, I hope I have something to offer. I think that when one looks at those options carefully, it is clear that they reinforce the idea that the nature of the government action here is and has the character of a taking. It is very much akin to a physical occupation of these properties for at least 20 years, setting aside the passage of HOPE. The reason I say that is there are two options under the statute. One was the use agreement option. The other is the preservation sale option. Both options, no matter what happens, you take them or you don't take them, assuming they're consummated. In other words, a use agreement is signed and money is paid or the sale occurs. In both options, that property remains under the use restrictions that are required by OLIPA. But you said that the takings should be judged before they entered into the use agreements.  Well, but the question is whether there was a taking looking at it from the perspective of the owners the day before the agreements went into it. Yes, I was answering the Court's question in the context of dealing with the impact of the use agreement on extending the period of the taking. Well, it's going to be the same answers regardless of the context, right? Right, and I guess the point I'm trying to make is the fact that the government offered these options does not detract from the fact that they were putting a severe restriction on the use of these properties that was going to have a severe impact on these owners. Well, that may be, but how can we ignore what the impact was the way the Court of Federal Claims did? I don't think the Court did ignore what the impact was. I think the Court did consider it in the proper context, and that is prong two of the takings analysis. Well, they didn't consider it in connection with the economic impact analysis. No, that's right, because I don't think it's appropriate to allow the government to take a dollar and pay back 50 cents and thereby avoid a judicial determination as to whether or not 50 cents was enough. And that would be the effect if you allow the government's partial offer of compensation to be considered on the takings side of the equation. They can avoid judicial review as to whether or not what they paid in a preservation sale was fair market value. Well, I don't understand that. Well, they can sue, so they get judicial review. What do you mean avoid judicial review? Well, the Court wouldn't get to the issue of whether fair market value was given, but if it was decided, there was no taking. And the Congress's decision about what compensation should be paid could never effectively be reviewed by a court. Should the compensation be more than the appraised value? The compensation should be just compensation. Should it be more than the appraised value of the process? Than the appraisals in this case, absolutely. The appraisals in this case, as the evidence before the Court showed and the Court commented, indicated the preservation value, quote-unquote, under the regulatory scheme is dubious. Isn't that what happened here with Chancellor? The appraised value was at $7 million, and the damages that the Court found was $10.5 million? As I say, the appraisal is not fair market value by any objective standard. Inherently, it is simply not. What was your appraiser's value? We did not put on appraisal evidence, Your Honor. This is a lost income issue. You didn't put on appraisal evidence? We didn't have an appraisal. How can you object to the appraisal evidence that was put on it if you didn't put on any contrary evidence? Well, Your Honor, that appraisal was part of the process, the government process, under LIFRA, and therefore is pursuant to the rules which are set up such that true fair market value between a willing buyer and a willing seller on an open market simply are impossible. But the definition under the statute of the appraisal is supposed to be fair market value? No. If the Court looks at the definition in the regulations as to how those appraisals arrive at preservation value as the term, it's not fair market value. All right. Thank you, Mr. Ginzburg. You have five minutes of rebuttal. If I could ask you just one question. There's been a lot of reference both by you, Mr. Bress, Mr. Roberts, and by members of the panel to Senega 8, which involves, as we know, the model plaintiffs. What, if any, use do you say the Court should make of Senega 8 in this case? Should it look to it for anything, or is it your view that we should totally ignore it, even though it is a precedential opinion? I think that the caveats that the Court intentionally placed more than once, almost on every single significant holding in that case, rendered it sui generis for those plaintiffs, and it should not be binding or controlling for this analysis. That Court understood that we had no discovery in that case. It was up on summary judgment. It was up on summary judgment, not on those issues. And the Court recognized that when we came back with a full record, that the Court would want to take it again with a full record. How should we deal with the finding on the model plaintiffs in Senega 8? Is that just bygones be bygones? Well, that is now a trial court on whether there's damages for those model plaintiffs. Under what analysis? What under – there's a – the Court in Independence Park remanded with respect to whether rent control, Los Angeles rent control, will bar the plaintiffs from damages, and if not, then a measure of what the damages they will receive. So it's not only – Excuse me, only for the model plaintiffs in Senega 8? Yes, sir. The plaintiffs did not put on an appraisal of the fair market value of the property. Neither plaintiffs did. In fact, they use those appraisals that we rely on and say those are fair market value, those are what they want to buy. All the plaintiffs – those are used in the snapshot approach to measure economic impact for all the plaintiffs. So if those numbers aren't valued, the snapshot approach is wrong and the determination is wrong for all of those plaintiffs. Those numbers are relied on by the court to make the snapshot approach work for them. With respect to the tax benefits, this is what the trial court said about the tax benefits. In sum, this evidence regarding taxation does not undermine the reasonableness of plaintiffs' expectations to repay. And the pre-1986 tax regime provided no specific incentive to sign a HUD regulatory agreement. What the court is saying is it's not going to compare them. It does not compare them. And so we believe that is legal error. With respect to the plaintiffs, there were people who tried to give us the burden of proof. We did not prove that they could have sold their market value. We did not prove this. We did not prove that. They have the burden of proof. We did have people testify. We had appraisers come in and they testified that if the plaintiffs had gotten their preservation value, if they had sold for those values, they would have done better than fair market value. And the plaintiffs didn't put on anybody to contest that. The fact that the tax benefits run out after 20 years doesn't mean that they weren't significant or they weren't the reason to invest. It just means that after 20 years, they had recouped a significant profit. And finally, this is my last point. The court asked about the limited versus the general. The trial court says expressly that he won't look at what the limited partners thought. That that doesn't go into his investment-backed expectations. We'll only look at – the plaintiffs did not have a limited partner to stand for anybody. We will only look at what the general partners said. In fact, the managing partners. We did have lots of general partners who didn't show up either for the various templates. And we challenged that. We said that you have to look at all the owners because they own the property as partners. And in fact, for some of the plaintiffs, they own the majority of the ownership – of the partnership. And unless the court has more questions, we will. Thank you both. We'll take the case under advisement. Thank you. All rise.